IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JOHN A. BERNARDI,

                        Plaintiff,                       OPINION and ORDER

    v.                                                08-cv-758-slc

BRIAN KLEIN and MANDY CAYGILL,

                        Defendants.

---

On December 31, 2006, defendants Brian Klein and Mandy Caygill, two police officers for the Village of Hazel Dean, Wisconsin, stopped plaintiff John Bernardi and later arrested him on suspicion of drunk driving.  After results of a blood test showed that plaintiff had no ethanol in his blood, plaintiff brought this lawsuit under 42 U.S.C. § 1983 and state law.  Two motions are before the court: (1) defendants' motion for summary judgment, *see* dkt. 13; and (2) plaintiff's motion for leave to amend his complaint, *see* dkt. 24.

I will deny plaintiff's motion for leave to amend his complaint as unnecessary.  Plaintiff does not seek to add any new allegations to the lawsuit; he simply wishes to clarify that some of his allegations apply to his federal law claim in addition to his state law claim.   That is not required.  Even after *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), Fed. R. Civ. P. 8, simply requires a plaintiff to provide notice of a claim that is plausible on its face. *Brooks v. Ross*, 578 F.3d 574, 580-81 (7th Cir. 2009).  Rule 8 does not require plaintiffs to match facts with a particular legal theory—it is not even necessary for plaintiffs to *include* legal theories in a complaint. *Jogi v. Voges*, 480 F.3d 822, 826 (7th Cir. 2007); *see also Bartholet v. Reishauer A.G. (Zurich),* 953 F.2d 1073, 1078 (7th Cir. 1992) ("[T]he

complaint need not identify a legal theory, and specifying an incorrect theory is not fatal."). Plaintiff did all he needed to do by giving defendants notice of the facts that make up his claims.

Plaintiff's claim is divided into five parts:  (1) defendants lacked reasonable suspicion to stop his car; (2) defendants lacked reasonable suspicion to require him to perform field sobriety tests; (3) defendants lacked probable cause to arrest him; (4) defendants committed the tort of intentional infliction of emotional distress through their actions during the stop and arrest; and (5) defendants intentionally omitted important facts from their police report.  I conclude that I must grant summary judgment to defendants on all but the first claim.

With respect to the defendants' decision to stop plaintiff, I must deny summary judgment because the parties dispute the facts that defendants rely on to support a finding of reasonable suspicion.  However, I am granting summary judgment for defendants on plaintiff's remaining Fourth Amendment claims because plaintiff has failed to show that defendants' decisions to conduct field sobriety tests and arrest him violated clearly established law. Plaintiff's claim for intentional infliction of emotional distress must be dismissed, both because he failed to comply with the notice of claim statute, Wis. Stat. § 893.80, and because the evidence shows that he cannot meet the elements of the claim.  Finally, plaintiff has failed to show that any misinformation in the arrest reports violated his constitutional rights.

From the parties' proposed findings of fact and the record, I find that the following facts are undisputed:

UNDISPUTED FACTS

On December 31, 2006, around 8:00 p.m., plaintiff John Bernardi, a 61-year-old man, was driving home from dinner on Highway 80 outside the Village of Hazel Green in

southwestern Wisconsin.  Plaintiff was with his wife and three other guests around the same age.

Defendant Brian Klein, a police officer for the village, also was traveling on Highway 80, which

is a two-way, single lane highway with a speed limit of 55 miles per hour.  Klein was off duty at

the time.

Defendant Klein observed plaintiff's car and began to follow it.  The weather was very

windy, causing plaintiff to slow down when the wind hit his car.  (The parties dispute how fast

plaintiff was going.  Defendants say that plaintiff was going as slow as 45 miles per hour;

plaintiff says he was going 50-55 miles per hour.  The parties also dispute whether plaintiff's car

crossed the center line. )

Suspecting that the vehicle's driver might be impaired, defendant Klein called the Grant

County Sheriff's Department.  Klein gave the department plaintiff's license plate number and

car color.[1]  The dispatch officer told Klein that defendant Mandy Caygill was on duty in Hazel

Green; Klein told the dispatch officer that he would be following plaintiff's car into the village.

The dispatch officer contacted defendant Caygill, telling her that defendant Klein had

observed "a possible drunk driver."  The officer gave Caygill the description, license plate number

and location of plaintiff's car.  Once Caygill spotted plaintiff's car, she began to follow it,

positioning her squad car behind plaintiff's car and ahead of Klein's.  Klein flashed his headlights

at Caygill to signal that she was following the right car.

Defendant Caygill followed plaintiff's car for 7/10 of a mile.  (The parties dispute whether

plaintiff's car crossed the center line during this time.)  At approximately 8:30 p.m., Caygill

---

[1]  In their proposed findings of fact, defendants say that Klein reported that plaintiff "was driving erratically" and that Klein "believed the driver was drunk,"dkt. 15, at ¶ 36, but neither of these statements is included in Klein's affidavit, dkt. 16, which is the only evidence defendants cite in support of that proposed finding of fact.

activated her emergency lights and stopped plaintiff's car.  This was her first traffic stop for suspected drunk driving.

Caygill approached plaintiff's car.[2]  When plaintiff asked Caygill why she had stopped his car, she told him that he had crossed the center line.  Plaintiff produced his driver's license upon request and Caygill took the license back to her squad car.  Defendant Klein ran a check on plaintiff's license, which showed that plaintiff had no previous arrests for impaired driving.  Klein shared this information with defendant Caygill.

Defendant Caygill returned to plaintiff's car and asked him whether he had been drinking; plaintiff said that he had "one margarita before dinner."  The passengers in the car concurred.  (The parties dispute whether plaintiff smelled like alcohol.)  Plaintiff spoke "slowly and deliberately."  Plaintiff did not slur his speech at this time or any other time throughout the evening and he never changed the way he spoke.

Defendant Caygill instructed plaintiff to step out of his car to perform field sobriety tests.  Plaintiff responded that he did not want to perform the tests because he had not done anything wrong.  After Caygill threatened to arrest plaintiff, he agreed to perform the tests.

Plaintiff informed defendants that he was suffering from neck and back problems and that he was being treated by a chiropractor.  In addition, plaintiff said that he needed to use the bathroom.  (The parties dispute whether plaintiff said he was suffering from "leg" problems and whether he told defendants he was not sure that he could perform the tests.)  Defendants did

---

[2]  The parties do not propose any facts regarding defendant Klein's whereabouts at the outset, but they agree that he became involved in the traffic stop.  In Klein's arrest report he states that he parked behind Caygill and spoke with her; she told him that he "could stay as the cover officer."  Dkt. 58.  The video of the stop taken from Caygill's squad car shows a man in plain clothes standing next to Caygill during the entire incident.  Dkt. 11, exh. 2.

not ask plaintiff's wife for confirmation of plaintiff's statements.  The air temperature was "freezing cold" and the wind was still "blowing hard."

Defendant Caygill first conducted the Horizontal Gaze Nystagmus test, which Caygill had not conducted before.  The test is 77% accurate and is the most reliable of all the tests. Caygill instructed plaintiff to follow her pen with his eyes without turning his head.  Caygill had been trained to

> look for three possible clues in each eye: (1) as the eye moves from side to side, whether it moves smoothly or jerks, (2) when the eye moves as far to the side as possible and is kept at that position, whether it jerks distinctly, and (3) as the eye moves toward the side, whether it starts to jerk prior to a 45 degree angle.

Dft.'s PFOF, dkt. 15, ¶ 83.

As plaintiff followed the moving pen, he moved his head.  Plaintiff told Caygill that he moved his head because she moved the pen outside his field of vision.  (The parties dispute whether plaintiff's eyes jerked during the test.)

Next, defendant Caygill administered the "one leg stand" test, which requires the subject to count to 30 out loud with one leg raised approximately six inches off the ground, keeping the raised foot parallel to the ground and his arms at his sides.  After Caygill demonstrated the test for plaintiff, she instructed him to perform the test, elevating his foot until she told him to put it down.  After six seconds, plaintiff put his foot down.  During a second attempt, plaintiff swayed, used his arms for balance and then put his foot down after twelve seconds.

Third, defendant Caygill administered the "walk and turn" test, which requires the subject to perform these maneuvers: (1) take nine heel-to-toe steps on a straight, imaginary line while watching his feet, keeping his hands by his side and counting each step out loud, (2) turn

180 degrees by planting the front foot on the line and taking a series of short, choppy steps with the other foot, (3) take nine heel-to-toe steps back on the same line while watching his feet, keeping his hands by his sides and counting each step out loud.  Caygill demonstrated the test to plaintiff and gave him instructions.  During the test, plaintiff did not perform the turn as instructed, lost his balance, began a new line while walking back and walked 16 steps instead of nine.

Finally, defendant Caygill asked plaintiff to perform an "alphabet test," which is not a "standardized" field sobriety test like the other tests she administered.  Plaintiff performed this test without difficulty.

While plaintiff was performing the tests, Caygill "heard the release of gas from the Plaintiff's bottom on more than one occasion."  Each time this happened, plaintiff told defendants that he "desperately needed" to use the bathroom.  Defendants denied these requests.

After plaintiff completed the tests, defendant Caygill informed plaintiff that he was being placed under arrest for operating while under the influence of an intoxicant.  However, instead of handcuffing plaintiff, she and defendant Klein attempted to administer a preliminary breath test, something Caygill had not done before.  Defendants administered the test three times, but they did not show plaintiff the reading on the device for any of the three tests.  (The parties dispute whether the device was malfunctioning because it was "overheated" or whether the device indicated that plaintiff did not have alcohol in his breath.)

Defendant Caygill handcuffed plaintiff and placed him in her squad car.  Instead of driving to the hospital to administer a blood draw, she drove plaintiff to the police department

so that he could use the bathroom.  Defendants took plaintiff down a flight of stairs to the basement and into a bathroom.  Defendant Klein entered the stall with plaintiff while defendant Caygill waited in the entry way to the bathroom.  The stall had no door.  Plaintiff attempted to undress himself but could not do so because of the handcuffs.  Klein removed the handcuff from plaintiff's right hand and placed it on his (Klein's) right hand.  Plaintiff then managed to undo his pants with his free hand.  When plaintiff finished, he "had to lift his entire body off the toilet to wipe himself" with toilet paper "[b]ecause his left arm was extended and connected at the wrist to" Klein.  Eventually, Klein told plaintiff that was the "last time" he could wipe himself.

Plaintiff was able to pull up his clothing with one hand, but he could not tuck in his shirt or button his pants.  Defendant Klein put the handcuff back on plaintiff's right hand and tried to assist plaintiff.  He told plaintiff to "suck in his stomach" and then buttoned plaintiff's pants.

Defendant Caygill drove plaintiff to the hospital, where plaintiff consented to a blood test.  Caygill refused plaintiff's request to take the handcuffs off so that he could sign the form.  After plaintiff finished giving blood and his paperwork was completed, defendant Caygill released plaintiff to his wife.

When the test results came back, they showed that no ethanol was detected in plaintiff's blood.  On March 24, 2007, plaintiff filed a complaint with the Hazel Green Police Department regarding defendants' conduct on December 31.  Eventually, the village dismissed the charge.[3]

---

[3]  Neither side proposed any facts about the disposition of the charge.  However, plaintiff says in his brief that the "Village of Hazel Green knew this was a blunder and dismissed the case."  Dkt. 26, at 6.  Defendants do not contradict this assertion in their reply brief.

OPINION

## I. The Traffic Stop

Under the Fourth Amendment, an officer may stop a car if the officer has a reasonable suspicion that the driver has violated the law. *Delaware v. Prouse*, 440 U.S. 648 (1979); *U.S. v. Riley*, 493 F.3d 803, 808-09 (7th Cir. 2007). "Reasonable suspicion is less than probable cause, but more than a hunch." *U.S. v. Grogg*, 534 F.3d 807, 810 (7th Cir. 2008). Defendants contend that they had reasonable suspicion that plaintiff was driving under the influence of alcohol because:

- Plaintiff was driving ten miles per hour under the speed limit while defendant Klein was following him;

- Plaintiff was crossing the center line;

- It was New Year's Eve.

In addition, defendant Caygill relies on the "collective knowledge" doctrine, under which "law enforcement officers are considered to possess information known to other officers but not known to them." *U.S. v. Whitaker*, 546 F.3d 902, 905 (7th Cir. 2008).

If these facts were undisputed, then this traffic stop might be deemed reasonable and summary judgment for defendants might be appropriate. But plaintiff disputes most of them.[4] Plaintiff asserts that he was driving between 50 and 55 miles per hour (the speed limit was 55), slowing down only when the wind hit his car. Even defendant Klein initially stated in his police report that plaintiff was traveling as fast as 50 miles per hour. Dkt. 58, at 1. In their reply brief, defendants argue that defendant admitted in his deposition that "he may have been traveling

---

[4] Although defendant Caygill made the traffic stop, defendants do not argue that defendant Klein should be dismissed with respect to this claim on the ground that he was not personally involved.

8

45 miles per hour." Dkt. 32, at 2.  This is misleading.  In his deposition, plaintiff testified that

he "might have been going 45 at a point . . .  Anytime the wind caught my vehicle, I naturally

slowed down." Dkt. 11 at 50.  Defendants do not suggest that it is suspicious for a driver to

reduce his speed momentarily in response to adverse weather conditions.[5]  Thus, defendants

cannot rely on plaintiff's reduced speed as a justification for the traffic stop sufficient to obtain

summary judgment.

The same is true for plaintiff's handling of the car.  Other passengers in the car (one of

whom is a driving instructor) testified that plaintiff never went over the center line, never

swerved the car and never drove in any other unsafe or inappropriate manner.  *E.g.*, William

Murphy Aff. ¶11, dkt. 52; Cathy Murphy Aff. ¶10, dkt. 29-4.  In their reply brief, defendants

say that plaintiff admitted in his deposition that he felt the car "pulling one way" because of the

wind.  Dkt. 32, at 2.  However, defendants do not deny that it was windy and they do not argue

that it is suspicious for a driver to adjust his vehicle's position to account for wind gusts.

Nor does the collective knowledge doctrine help the defendants at the summary judgment

stage.  As stated in *Whitaker*, 546 F.3d at 905, that doctrine allows one officer to rely on

"information *known* to other officers."  In this case, plaintiff disputes the observations cited by

defendant Klein, which means it is disputed whether Klein *did* know that plaintiff was driving

unsafely.  Perhaps it was not unreasonable for Caygill to accept as true what Klein was telling

her, but because the parties dispute was Klein actually saw, his observations cannot be used at

this juncture to find that the traffic stop was reasonable.  Defendants point out that

---

[5]  Indeed, Wisconsin traffic law *requires* that motorists drive at an appropriate reduced speed when
special hazards exist by reason of weather.  Wis. Stat. Sec. 346.57(3).

9

> effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information.

*United States v. Hensley*, 469 U.S. 221, 231 (1985).

This is true as far as it goes, but it doesn't advance the analysis on summary judgment. The only information Caygill received from the dispatch officer was that Klein had observed a "possible drunk driver." This report certainly justified Caygill responding to the scene to investigate, but it did not provide any actual support for a traffic stop. Under *Hensley*, Caygill would have a better argument if dispatch had directed her to perform a traffic stop based on Klein's telephone call. Then the reasonable suspicion analysis would focus on what Klein had observed, leaving Caygill free to argue that she merely implemented the stop based on *Klein's* reasonable suspicion. But that's not what happened here, so we can set the collective knowledge doctrine aside for the time being.

This leaves the day of the year. Although both sides agree that heightened awareness of drunk driving is appropriate on New Year's Eve, this is a very small brick in the reasonable suspicion wall, particularly so early in the evening. Traffic stops like this one must be supported by individualized suspicion of wrongdoing. *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). Because plaintiff genuinely disputes all of the individualized facts defendants rely on to justify the stop, I cannot resolve on summary judgment the question whether defendants violated plaintiff's rights under the Fourth Amendment by stopping his car. Further, if I view the facts in the light most favorable to plaintiff, as I must, *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009), then defendants are not entitled to qualified immunity because it was

clearly established in December 2006 that officers may not stop a car without particularized facts creating a reasonable suspicion that the driver is breaking the law.

If this were a criminal case, a conclusion that the stop was not supported by reasonable suspicion could mean that any subsequent searches or seizures were invalid as well under the "fruits of the poisonous tree" doctrine. *E.g.*, *U.S. v. Cellitti*, 387 F.3d 618, 624 (7th Cir. 2004). Plaintiff argues that the same rule should apply in this case. Plt.'s Br., at 30, dkt. 26 ("Officer Caygill's stopping of the Plaintiff's vehicle was unlawful from the start, so any subsequent detention, no matter how short, was also unlawful."). However, as defendants point out, in *Whitwell v. Hoyt*, No. 04-C-981-C, 2006 WL 469634 (W.D. Wis. Feb. 26, 2006) (Crabb, J.), this court joined many other courts in concluding that one violation under the Fourth Amendment does not taint all later actions for the purpose of a civil claim brought under 42 U.S.C. § 1983. *E.g.*, *Townes v. City of New York*, 176 F.3d 138, 149 (2d Cir. 1999); *Padilla v. Miller*, 143 F. Supp. 2d 479 (M.D. Pa.2001); *Wren v. Towe*, 130 F.3d 1154, 1158 (5th Cir. 1997); *Mejia v. City of New York*, 119 F. Supp. 2d 232, 254 n. 27 (E.D.N.Y.2000); *Reich v. Minnicus*, 886 F. Supp. 674 (S.D. Ind.1993). *See also Nixon v. Applegate,* 2008 WL 471677, *4 (D.S.C. 2008) (following *Whitwell* and other cases). Judge Crabb agreed with these other courts that the rationale for the doctrine, as its name suggests, is to deter officers from using an illegal search or seizure to acquire evidence against a suspect. That rationale has no application in a civil claim for damages:

> If plaintiff was stopped in violation of the Fourth Amendment, he may recover for that wrong; however, it would be unreasonable to permit him also to recover damages for his "wrongful" arrest when the undisputed facts conclusively demonstrate that [the officer] had probable cause in fact to arrest him.

*Whitwell*, 2006 WL 469634, at *4.  Because plaintiff cites no authority that would undermine the conclusion in *Whitwell*, I see no reason to depart from its holding.

## II.  The Field Sobriety Tests

The same standard of reasonable suspicion applies when an officer requires a driver to perform field sobriety tests.  *County of Jefferson v. Renz*, 231 Wis. 2d 293, 310, 603 N.W.2d 541 (1999).  In arguing that they had reasonable suspicion to require such tests, defendants say that plaintiff smelled like alcohol, that he admitted to drinking alcohol and that his speech was "slow and deliberate."

Plaintiff and his passengers deny that he smelled like alcohol, *e.g.*, Jim Ritterbusch Aff. ¶ 9, dkt. 29; Joyce Ritterbusch Aff. ¶ 16, dkt. 29-3, so defendants cannot rely on that fact at summary judgment.  In fact, even defendant Klein admitted that he did not detect any odor of intoxicants coming from plaintiff.  Dfts.' Resp. to Plt.'s PFOF ¶ 49, dkt. 33.  With respect to plaintiff's speech, it is undisputed that plaintiff spoke clearly, without slurring.  Defendants do not suggest that plaintiff was inarticulate or confused or that he raised his voice or became belligerent.  In this context, it is difficult to see how a slow manner of speaking could give rise to suspicion.  Defendants' only support for relying on "slow" speech is an unpublished decision from the Wisconsin Court of Appeals.  *State v. Croell*, 2005 WL 225027 (Wis. Ct. App. 2005).  However, even in that case, the court simply included without explanation "slow speech" as one of many other factors suggesting that the suspect was intoxicated.  *Id.* at *2.

This leaves plaintiff's admission that he had "one margarita before dinner."  Defendants know better than to argue that it would be reasonable to believe that an adult male would have

reached a prohibited alcohol concentration an hour or two after consuming one mixed drink with food.  Instead, they assert that impaired drivers tend to lie about how much they had to drink.  That may be empirically true, but an officer may not simply assume that a driver is lying without some observable  support for this assumption.  Otherwise, the officer could require *any* driver to perform field sobriety tests after asking about alcohol consumption, since the officer automatically could accept all inculpatory answers as true and reject all exculpatory answers as false.  In this case, because plaintiff disputes the facts that defendants rely on to show that he was impaired, I conclude that his admission of having one drink is not sufficient to establish reasonable suspicion.

The stumbling block for plaintiff on this claim arises from the doctrine of qualified immunity.  Plaintiff characterizes the question as one of "reasonableness."  This is true, but it is not simply a matter of the officer making a reasonable assessment of the facts.  A defendant is entitled to qualified immunity unless the plaintiff can show that the defendant was unreasonable in applying clearly established *law*.  *Gonzales*, 578 F.3d at 540.   In other words, the plaintiff must show that there is "a clearly analogous case establishing a right to be free from the specific conduct at issue" or that "the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights."  *Id.* (quoting *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th  Cir. 2001)).  Plaintiff has missed this aspect of qualified immunity because he fails to cite *any* cases to show that his rights were clearly established.

One might argue that qualified immunity is inappropriate with respect to the field sobriety tests because it is obvious that reasonable suspicion is not established by an admission of having one drink with dinner.  At least one district court has hinted at this:

> The second prong of the qualified immunity analysis-whether the
> right not to be arrested without probable cause was clearly
> established when Defendant Jordan arrested Plaintiff in July of
> 2002-is satisfied as well. *If Plaintiff's alleged facts are true, he was not
> swerving, he had only had one drink, and there was not even reasonable
> suspicion to stop him*, much less probable cause to arrest.

*Allen v. Washington State Patrol*, 2007 WL 1140261, *5 (W.D. Wash. 2007) (emphasis added).

However, the issue in *Allen* was probable cause; the comment regarding reasonable suspicion was

dicta. Similarly, there seem to be a number of cases in which courts have held that an admission

like plaintiff's does not provide *probable cause* to arrest. *E.g., Montgomery v. De Simone*, 159 F.3d

120, 125-26 (3d Cir. 1998); *State v. Renzoni*, 2001 WI App 121, 244 Wis. 2d 288, 628 N.W.2d

437 (unpublished).

Neither side cites any cases that address the question whether it is clearly established that

an admission of having one drink does not provide *reasonable suspicion* to perform field sobriety

tests. The court's research unearthed only one relevant case, which resolved the issue against the

plaintiff:

> [The plaintiff's] statement that he 'had one beer three hours ago'
> provided [the officer] with reasonable suspicion to conduct the
> field sobriety tests, or at the very least provided her with 'arguable
> reasonable suspicion' entitling her to qualified immunity.

*Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1207 (10th Cir. 2008). Although *Vondrak* is not

a Seventh Circuit case, plaintiff does not cite any controlling authority that contradicts it.

Accordingly, I conclude that *Vondrak* undermines any argument that defendants' violation was

obvious or that there is a "sufficient consensus, based on all relevant case law, indicating that the

official's conduct was unlawful," *Landstrom v. Illinois Dept. of Children and Family Services*, 892

F.2d 670, 676 (7th Cir. 1990), that would overcome defendants' qualified immunity defense.

### III.  Plaintiff's Arrest

An arrest requires probable cause that a crime has been committed.  *Thompson v. Wagner*, 319 F.3d 931, 934 (7th Cir. 2003).  "In order to have probable cause for an arrest, law enforcement agents must reasonably believe, in light of the facts and circumstances within their knowledge at the time of the arrest, that the suspect had committed or was committing an offense."  *Payne v. Pauley*, 337 F.3d 767, 776 (7th Cir. 2003).

The question is whether plaintiff's performance on the four field sobriety tests provided defendants with probable cause to arrest him for drunk driving.  It is undisputed that plaintiff performed the alphabet test without difficulty.  In addition, I will treat the results of the Horizontal Gaze Nystagmus test as disputed for the purpose of summary judgment.  Defendants have been unable to explain why they saw plaintiff's eyes jerking despite blood tests showing that he had no alcohol in his blood.  By defendants' own assertion, the Horizontal Gaze Nystagmus is the most accurate of all the tests because the suspect has no control over the jerking movement.  Further, it is arguably unfair to consider the results of a test that is impossible for plaintiff to contradict (because plaintiff was unable to tell whether or not his eyes were jerking and no one but defendants observed the test).

However, this still leaves the "walk and turn" test and the "one leg stand" test.  It is undisputed that plaintiff was unable to complete either test successfully.  With respect to the one leg stand test, he could not keep his leg raised for more than 12 seconds even after two attempts and he swayed and used his arms for balance.  With respect to the walk and turn test, he was unable to perform the turn as instructed, lost his balance, began a new line while walking back and walked sixteen steps instead of nine as he was told.

Wisconsin courts have stated repeatedly that field sobriety tests usually are the best indication of a person's impairment.  *State v. Swanson*, 164 Wis. 2d 437, 453-454 n. 6, 475 N.W.2d 148, 155 n. 6 (1991), *overruled on other grounds*, *State v. Sykes*, 2005 WI 48, 279 Wis .2d 742, 695 N.W.2d 277; *State v. Wille*, 185 Wis. 2d 673, 684, 518 N.W.2d 325, 329 (Ct. App. 1994). *See also U.S. v. Horn*, 185 F. Supp. 2d 530, 532-33 (D. Md. 2002) ("The results of properly conducted [field sobriety tests] may be considered to determine whether probable cause exists to charge a driver with driving while intoxicated ('DWI') or under the influence of alcohol ('DUI')."); *State v. Waltz*, 2003 ND 197, 672 N.W.2d 457, 462 (2003) ("We have previously evaluated a person's failure to successfully complete field sobriety tests as an indicator of physical or mental impairment."); Whited III, Flem and Nichols, Donald H., *Drunk Driving Litigation: Criminal and Civil* 5:5 (2d ed. 2009) ("Field sobriety tests are generally relied upon to determine probable cause after the stop of the vehicle. Courts generally will find probable cause where the suspect fails field sobriety tests.")  Although plaintiff passed some tests and failed others, courts have held than an uneven performance is sufficient to support a finding of probable cause.  *E.g.*, *State v. Wilson*, 846 S.W.2d 796 (Mo. Ct. App. 1993); *see also City of Madison v. Engel*, 2008 WL 5336696, *7 (Wis. Ct. App. 2008) (unpublished) (finding of probable cause supported when suspect failed one leg stand test and walk and turn test).

Plaintiff does not challenge the reliability of the tests defendants used or otherwise argue that poor performance on the tests ordinarily would not provide officers with probable cause to arrest.  Instead, plaintiff argues that defendants failed to take into account a number of extenuating factors, such as the back, neck and leg problems he suffered, the cold and windy conditions, and his urgent need to use the bathroom.

17

Plaintiff may have had good reasons for his poor performance on the tests, but this does not mean that defendants were obliged to disregard the test results.  Of course, defendants could have chosen to take plaintiff at his word.  *E.g.*, *State v. Begicevic*, 2004 WI App 57, 270 Wis. 2d 675, 683-85, 678 N.W.2d 293, 297-98 ("[The officer] explained and demonstrated the one-legged stand test but when [the suspect] responded that he had a leg injury, she went on to the heel-to-toe test.").  However, as defendants point out, officers are not required to make credibility determinations when a suspect makes an unverified representation; "they are entitled to act on the basis of observable events." *Hebron v. Touhy*, 18 F.3d 418, 423 (7th Cir. 1994). Because defendants could not observe plaintiff's stated physical ailments for themselves, they were not required to take his (or his wife's) word for it.  Courts routinely reject arguments that field sobriety tests must be disregarded because of the suspect's claimed injury or disability.  *E.g.*, *Sawyer v. Commonwealth,* 596 S.E.2d 81, 86-87 (Va. Ct. App. 2004) (rejecting testimony that suspect had a chronic lung condition which prevented her from successfully completing the breath alcohol test); *Harkins v. State*, 268 S.W.3d 740, 751 (Tex. Ct. App. 2008) (affirming drunk driving conviction despite defendant's testimony that he failed field sobriety tests because of "preexisting physical impairments"); *State v. Buckler*, 988 S.W.2d 565, 567 (Mo. Ct. App. 1999) (affirming conviction of driving while intoxicated even though defendant testified that he did poorly on the walk-and-turn test and was unable to complete the one-leg stand test because of physical disabilities to his left ankle and right knee).

That night the defendants were able to note the cold and the wind, and perhaps to some extent plaintiff's need to go to the bathroom (because they could hear him passing gas). However, plaintiff never explains specifically how any of these factors prevented him from

18

passing the tests.  For example, he does not say that he lost his balance at a moment when the wind was blowing against him.  Further, defendants were not required to contemplate all the reasons that plaintiff might be having difficulty with the tests.  "[P]olice may act on the basis of inculpatory evidence without trying to tote up and weigh all exculpatory evidence." *Hernandez v. Sheahan*, 455 F.3d 772, 777 (7th Cir. 2006).  *See also State v. Vantress*, 96 P.3d 867, 871 (Or. Ct. App. 2004) ("[A]n officer is not required to eliminate alternative explanations to indicia of intoxication before concluding that there is probable cause to arrest.")  Finally, even if defendants were required to give plaintiff the benefit of the doubt regarding the physical aspects of the tests, this would not explain plaintiff's repeated failure to follow directions, such as by walking too many steps and failing to walk back on the same line.

The breath test performed after plaintiff failed the field sobriety tests could be viewed as a complication.  Plaintiff's theory is that the breath test showed that he did not have any alcohol in his breath and that defendants administered the test a second and then a third time because they did not believe the results.  Defendants deny this; their version is that the device was malfunctioning because it "overheated."  Once again, plaintiff cannot directly contradict defendants' assertion because they did not show him the reading on the device.  Further, I share plaintiff's bemusement at why defendants persisted in retesting him if they knew that their device was malfunctioning.[6]  And one has to ask: why would a device that presumably had not been used recently "overheat" when used outdoors on a cold, windy December night?

---

[6]  As opposed to a suspicion, for instance, that they were getting zeros because plaintiff had not provided a sufficiently deep lung (alveolar) air sample for analysis by the PBT, and that they could get their "true" reading if they could just coax a better breath sample from plaintiff.

If I assume that the breath test showed that plaintiff was not intoxicated, that would undercut a finding of probable cause. One could reasonably argue that defendants should have reconsidered the arrest at that point and should have given more credence to plaintiff's explanations for failing the field sobriety tests. However, the rule of *Hernandez*, 455 F.3d at 777, is that officers are not required to reevaluate probable cause determinations. "[H]aving once determined that there is probable cause to arrest, an officer should not be required to reassess his probable cause conclusion at every turn, whether faced with the discovery of some new evidence or a suspect's self-exonerating explanation from the back of the squad car." *Thompson v. Olson*, 798 F.2d 552, 556 (1ˢᵗ Cir. 1986). In the face of conflicting evidence, officers confront difficult choices. Perhaps some officers would have concluded that plaintiff was safe to drive. However, that does not mean that defendants were required to disregard the field sobriety tests in favor of the breath test. *E.g.*, *State v. Baue*, 607 N.W.2d 191, 196 (Neb. 2000) (concluding that officers had probable cause to arrest for driving under the influence when suspect passed breath test and some field sobriety tests, but failed other field sobriety tests). After all, a breath test might rule out the influence of alcohol, but not the presence of other impairing drugs. *E.g.*, *Weil v. State*, 936 So. 2d 400, 405 (Miss. Ct. App. 2006); *State v. Petersen*, 676 N.W.2d 65, 71 (Neb. Ct. App. 2004); *State v. Baldwin*, 37 P.3d 1220, 1222 (Wash. Ct. App. 2001).

Finally, even if I were to conclude that defendants lacked probable cause when they arrested plaintiff, plaintiff still would have to show that the correctness of this conclusion was clearly established by the case law as of December 31, 2006 to overcome the qualified immunity defense. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). In light of cases such as *Hernandez*, *Thompson*

20

and *Baue*, plaintiff cannot make this showing, particularly because plaintiff fails to cite any cases in his favor on this point.

## IV.  Intentional Infliction of Emotional Distress

Defendants argue that plaintiff's claim for intentional infliction of emotional distress must be dismissed because he failed to comply with the notice of claim requirements under Wis. Stat. § 893.80 before filing the lawsuit.  *Schwartz v. City of Milwaukee*,  43 Wis. 2d 119, 128, 168 N.W.2d 107, 111 (1969) ("action shall be dismissed" if plaintiff fails to comply with notice of claim requirements).  In response, plaintiff says that dismissal is not appropriate because the complaint he filed with the chief of police gave defendants actual notice of his claim.  He cites the last sentence of § 893.80(1)(a), which says:

> Failure to give the requisite notice shall not bar action on the claim if the fire company, corporation, subdivision or agency had actual notice of the claim and the claimant shows to the satisfaction of the court that the delay or failure to give the requisite notice has not been prejudicial to the defendant fire company, corporation, subdivision or agency or to the defendant officer, official, agent or employee.

Unfortunately for plaintiff, his complaint with the police chief is insufficient to satisfy the notice of claim statute.  Section 893.80 includes *two* requirements.  Under § 893.80(1)(a), a plaintiff must provide "notice of the circumstances of claim."  "Actual notice" is a substitute for that requirement.  However, that still leaves the second requirement under Wis. Stat. § 893.80(1)(b):

> A claim containing the address of the claimant and an itemized statement of the relief sought is presented to the appropriate clerk or person who performs the duties of a clerk or secretary for the

21

> defendant fire company, corporation, subdivision or agency and
> the claim is disallowed.

Even if the defendant has notice of the circumstances of the claim, the plaintiff still must comply

with this provision. *Orthmann v. Apple River Campground, Inc.*, 757 F.2d 909, 911 (7th Cir. 1985).

Because plaintiff has failed to adduce any evidence that he submitted an itemized claim, I must

dismiss the complaint as to plaintiff's claim for intentional infliction of emotional distress.

Even if plaintiff had complied with the notice of claim statute, plaintiff has not adduced

evidence showing that defendants intended to inflict emotional distress on him, that their

conduct was "extreme and outrageous" or that his distress was "extreme and disabling," which

are three elements of this claim. *Rabideau v. City of Racine*, 2001 WI 57, 243 Wis. 2d 486, 501,

627 N.W.2d 795, 802-03. Although it is clear that plaintiff suffered significant embarrassment

and discomfort during the stop and the arrest, the evidence does not show that defendants

intended to harm him.

Plaintiff focuses on the defendants' refusal to allow him to use the bathroom during the

stop and their decision to keep him handcuffed when they took him to the bathroom at the

station. At the most, defendants' conduct could be described as unaccommodating. Officers are

not required to suspend field sobriety tests to allow a suspect to relieve himself. The later

incident in the bathroom was undoubtedly unpleasant for *all* involved, not just plaintiff.

Plaintiff does not suggest that defendants contravened their standard procedures by keeping him

handcuffed after the arrest and he does not cite any authority that would support a finding of

liability under the facts of this case. *Compare Alsteen v. Gehl*, 21 Wis. 2d 349, 360-61, 124

N.W.2d 312 (1963) (distress is extreme and disabling only if plaintiff is "unable to function in

. . . other relationships because of the emotional distress caused by [the] defendant's conduct";

court refused to find building contractor acted in sufficiently outrageous fashion despite his leaving job half-done, exposing his elderly client to elements); *Laska v. Steinpreis*, 69 Wis. 2d 307, 319, 231 N.W.2d 196, 203 (1975) (affirming trial court finding that plaintiff had not stated claim for intentional infliction of emotional distress when he alleged that defendant had spied on plaintiff's domestic activities and driven his car at high speed onto lawn of leased property, causing plaintiff's children to scatter; alleged conduct was neither extreme nor outrageous).

## V.  The Police Reports

Although plaintiff wished to amend his complaint to clarify that he wanted to assert a federal claim against defendants for putting false and misleading information in their police reports, he says almost nothing of this claim in his brief.  His sole discussion is one long sentence in his introduction:

> Plaintiff alleges that the Defendants lied and intentionally left relevant and exculpatory matters out of the arrest reports with the intent of concealing their own shocking conduct and with the further intent of portraying the Plaintiff in the worst possible light in order to increase their chances of obtaining a conviction for the drunk driving charge they made against him.

Dkt. 26, at 1.

I need not decide whether plaintiff has identified any false statements in the arrest reports.  Lies in a police report may be improper, but that does not necessarily make them unconstitutional.  Although officers may sometimes be held liable under *Brady v. Maryland*, 373 U.S. 83 (1963), for suppressing exculpatory evidence, this is only when the officers' actions led to an unfair *trial*, *Bielanski v. County of Kane*, 550 F.3d 632, 644-45 (7th Cir. 2008), a proceeding to which plaintiff was not subjected  because his case was dismissed.  A claim for malicious

prosecution would not necessarily require that plaintiff be tried by the state, *Mahoney v. Kesery*, 976 F.2d 1054, 1062 (7ᵗʰ Cir. 1992), but that claim is not recognized in this circuit as a constitutional tort.  *Newsome v. McCabe*, 256 F.3d 747 (7ᵗʰ Cir. 2001).  To the extent plaintiff wished to bring a state law claim for malicious prosecution, it would have to be dismissed for plaintiff's failure to comply with the notice of claim statute.  Accordingly, I will enter summary judgment in favor of defendants on this claim.


CONCLUSION

The court's decision to grant summary judgment in favor of defendants on all but one of plaintiff's claims is not an endorsement of how defendants treated plaintiff.  Drunk driving is a scourge that police should be encouraged to combat aggressively, but in this case there is room to question some of the defendants' acts and decisions.  Even so, not every questionable act or decision by a police officer rises to the level of a constitutional deprivation.  *McCoy v. Harrison*, 341 F.3d 600, 605 (7ᵗʰ Cir. 2003).  This is all the more true when the doctrine of qualified immunity is added to the mix.  *Cf. Tangwall v. Stuckey*, 135 F.3d 510, 520 (7ᵗʰ Cir. 1998) (police do not violate the Fourth Amendment just because they apprehend the wrong person; otherwise, the doctrine of qualified immunity would fall by the wayside).

ORDER

It is ORDERED that:

(1) Plaintiff John Bernardi's motion for leave to amend his complaint, dkt. 24, is DENIED as unnecessary;

(2) The motion for summary judgment filed by defendants Brian Klein and Mandy Caygill, dkt. 13, is DENIED with respect to plaintiff's claim that defendants violated his rights under the Fourth Amendment when they stopped him on December 31, 2006;

(3) Defendants' motion is GRANTED in all other respects.


Entered this 12th day of January, 2010.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

25